**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| **CONNIE DIXON**, individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>**WOUND TECHNOLOGY NETWORK, INC.,**<br><br>*Defendant.* | Case No.: 6:26-cv-00653 |

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Connie Dixon ("Plaintiff"), individually and on behalf of all others similarly situated, upon personal knowledge of facts pertaining to herself and upon information and belief as to all other matters, by and through undersigned counsel, brings this Class Action Complaint against Defendant Wound Technology Network, Inc. ("Woundtech" or "Defendant") and alleges as follows:

## INTRODUCTION

1. Plaintiff brings this action on behalf of herself, and all other individuals similarly situated ("Class Members") against Woundtech for its failure to secure and safeguard the personally identifiable information ("PII") and protected health information ("PHI") of Plaintiff and Class Members (collectively, "Private Information").

2. Woundtech is a healthcare provider with its principal place of business in Orlando, Florida, that provides mobile, in-home wound care services to patients across the country. In the regular course of its business, Woundtech collects and maintains highly sensitive patient data, including clinical notes, medical diagnoses, health insurance information, and clinical wound-

treatment photographs. Woundtech is required to maintain reasonable and adequate security measures to protect this information from unauthorized access and disclosure.

1. Between approximately December 6 and December 9, 2025, one or more unauthorized individuals infiltrated Defendant's network environment and exfiltrated patient data from Defendant's cloud-hosted systems (the "Data Breach"). According to public reporting, a threat actor group known as "FulcrumSec" subsequently claimed responsibility for the attack, alleging that it exfiltrated a substantial volume of data, including clinical wound photographs, clinical notes, referral documents, and patient demographic records, and published portions of the stolen data on the internet.[1]

2. Woundtech owed a duty to Plaintiff and Class Members to implement and maintain reasonable and adequate security measures to protect their Private Information. Woundtech breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices sufficient to prevent unauthorized access to and exfiltration of patient data.

3. Woundtech required its patients to provide sensitive PII and PHI as a condition of receiving care. This obligation to safeguard patient information was part of the bargain between Woundtech and its patients, including Plaintiff and Class Members.

4. As a result of Woundtech's failure to provide reasonable and adequate data security, Plaintiff's and Class Members' Private Information has been compromised. According to public reporting, threat actors associated with the breach claimed to have exfiltrated highly sensitive patient data, including clinical wound photographs and treatment-related records. Plaintiff and the

[1]DataBreaches.net, "If threat actors gave you a chance to redact the patient data they hacked before they leak it, would you take them up on the offer? Read about the Woundtech incident," Mar. 23, 2026, available at https://databreaches.net/2026/03/23/if-threat-actors-gave-you-a-chance-to-redact-the-patient-data-they-hacked-before-they-leak-it-would-you-take-them-up-on-the-offer-read-about-the-woundtech-incident/.

Class have suffered concrete injuries, including loss of privacy, emotional distress, loss of the benefit of their bargain with Defendant, and an increased risk of identity theft and medical identity theft.

5. Plaintiff and the Class will have to incur costs for third-party credit and identity-theft monitoring services for years to come as a direct result of the Data Breach.

6. Plaintiff brings this action to seek redress for these injuries, including out-of-pocket costs incurred to mitigate the risk of future harm, compensation for time and effort spent responding to the Data Breach, and injunctive relief requiring Woundtech to implement and maintain reasonable data security practices.

## THE PARTIES

7. Plaintiff Connie Dixon is a natural person and citizen of the State of Florida residing in Lakeland, Florida. Plaintiff is a former patient of Woundtech who received in-home wound care services from Defendant. In connection with that care, Woundtech collected sensitive personal and medical information about Plaintiff, including treatment photographs and related medical records. In March 2026, Defendant notified Plaintiff that her Private Information was compromised in the Data Breach.

8. Defendant Wound Technology Network, Inc. is a for-profit corporation with its principal place of business at 5979 Vineland Road, Suite 109, Orlando, Florida 32819.[2] Defendant provides mobile wound care services to patients in their homes, skilled nursing facilities, assisted living communities, and other residential settings across multiple states, including Florida, Texas, California, Nevada, Arizona, and Utah.[3]

---

[2]Texas Attorney General, Data Security Breach Report: Wound Technology Network, Inc., published Mar. 17, 2026, available at https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage.

[3]Woundtech, FAQs, available at https://woundtech.net/faqs/.

## JURISDICTION AND VENUE

9. This Court has subject-matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5,000,000, exclusive of interest and costs. There are over 100 putative Class Members, and at least one Class Member is a citizen of a state different from Defendant.

10. This Court has personal jurisdiction over Defendant because Defendant's principal place of business is in Orlando, Florida, within this District, it regularly conducts business in Florida, and maintains sufficient minimum contacts in the state.

11. Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because Defendant resides in this District and a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District.

## COMMON FACTUAL ALLEGATIONS

### A. Woundtech's Business and Collection of Sensitive Patient Data

12. This is a class action brought by Plaintiff, individually and on behalf of all persons who are similarly situated, seeking to redress Woundtech's violations of their privacy rights. Plaintiff and the other Class Members are patients and former patients whose information Woundtech collected and maintained in connection with providing wound care services.

13. Woundtech is a healthcare company founded in 1999 that provides specialized, in-home wound care to patients with complex wounds. Woundtech reports having conducted over two million documented patient encounters.[4]

14. Woundtech partners with hospitals, health plans, and provider groups to deliver care directly to patients where they reside. Its clinicians use mobile devices with customized

[4]Woundtech, Who We Are, available at https://woundtech.net/who-we-are/.

software to enter clinical assessment data into a cloud-based electronic medical record ("EMR") system.[5]

15. As part of its wound care services, Woundtech routinely collects, creates, and stores highly sensitive patient information, including demographic data (names, dates of birth, telephone numbers, gender), health insurance information, clinical notes documenting diagnoses and treatment, and clinical wound-treatment photographs depicting patients' wounds and the surrounding areas of their bodies.

16. The nature of Woundtech's practice means that the clinical photographs it collects frequently depict intimate and private areas of patients' bodies. Patients with complex wounds often have wounds located on or near areas that they would not ordinarily expose to anyone outside the medical treatment setting. The resulting photographs are among the most sensitive categories of protected health information that any healthcare entity can possess.

17. By obtaining, collecting, and storing the Private Information of Plaintiff and Class Members, Woundtech assumed legal and equitable duties and knew or should have known it was responsible for protecting such information from unauthorized disclosure.

18. Plaintiff and Class Members took reasonable steps to maintain the confidentiality of their Private Information and relied on Woundtech to keep their Private Information confidential and secure, to use this information for business purposes only, to make only authorized disclosures of this information, and to ensure that its systems were adequate to safeguard this information.

**B. The Data Breach**

[5] Woundtech, homepage, available at https://woundtech.net/.

19. On or about December 6, 2025, Defendant became aware of unusual activity in its network environment. Defendant retained a third-party cybersecurity firm to investigate the incident.[6]

20. The investigation revealed that between December 6 and December 9, 2025, an unauthorized individual or group gained access to Defendant's network and copied information from Defendant's systems. On December 31, 2025, the investigation confirmed that certain information "may have been copied by an unauthorized individual as part of the incident."[7]

21. According to Defendant's public breach notice, the types of information involved include: first name, last name, date of birth, telephone number, gender, clinical notes, medical health information, medical treatment information, medical diagnosis information, health insurance information, medical treatment images, and "a very limited amount of Social Security numbers."[8]

22. Upon information and belief, the Data Breach affected over 135,000 individuals, including 3,809 Texas residents, and the Texas Attorney General's Data Security Breach Report characterizes the incident as a "Hacking/IT Incident" involving a "Network Server."[9]

23. Woundtech disclosed Plaintiff's and Class Members' Private Information to unauthorized persons as a direct and/or proximate result of Woundtech's failure to safeguard and protect their Private Information.

24. Despite recognizing its duty to do so, Woundtech failed to implement adequate security safeguards to protect Plaintiff's and Class Members' Private Information.

---

[6] Wound Technology Network, Inc., Notice of Data Breach, Mar. 16, 2026, available at https://woundtech.net/notice-of-data-breach/.

[7] *Id.*

[8] *Id.*

[9] Texas Attorney General, *supra*, n.2.

**C. Public Reporting Regarding Exfiltration and Disclosure of Patient Data**

25. On or about January 2, 2026, nearly two months before Defendant began notifying patients, a threat actor group using the name "FulcrumSec" publicly claimed responsibility for the attack on Defendant's systems and posted data previews on a hacking forum.[10]

26. FulcrumSec has been linked to multiple data exfiltration incidents since approximately September 2025. Public reporting describes the group's model as involving data theft from cloud-hosted systems, followed by extortion demands and public posting of stolen data if negotiations fail.[11]

27. Upon information and belief, based on public reporting, FulcrumSec exfiltrated a substantial volume of data from Defendant's cloud-hosted systems, including database exports containing clinical wound assessment notes and patient demographic records, and files from cloud storage containing clinical wound photographs and referral documents.[12]

28. Upon information and belief, following a period of unsuccessful negotiations between FulcrumSec and Defendant, FulcrumSec claimed to have published portions of the stolen data on publicly accessible websites, thereby increasing the risk of misuse of exfiltrated patient records.[13]

29. Public reporting indicates that a substantial volume of data had already been exfiltrated before Defendant's remedial measures took effect. This indicates that Defendant's

---

[10]DataBreaches.net, *supra*, n.1.

[11]Dataminr, "Cyber Intel Brief: FulcrumSec Breach of youX," Feb. 2026, available at https://www.dataminr.com/resources/intel-brief/cyber-intelligence-brief-fulcrumsec-breach-of-youx/; Shenouda.nl, "New Threat Actor: FulcrumSec," Dec. 2025, available at https://www.shenouda.nl/new-threat-actor-fulcrumsec/.

[12]DataBreaches.net, supra n.1.

[13]*Id.*; see also ClaimDepot, "Woundtech Data Breach Investigation," Mar. 18, 2026, available at https://www.claimdepot.com/investigations/woundtech-data-breach-2026.

access controls, monitoring, and data segmentation were insufficient to prevent or contain the exfiltration of patient data even after the intrusion was detected.[14]

**D. The Data Breach Was Preventable**

30. Had Woundtech maintained industry-standard safeguards to monitor, assess, and update security controls and related system risks, Woundtech could have prevented or materially limited the Data Breach. Woundtech's failure to implement adequate security controls is inexcusable.

31. Woundtech was at all times fully aware of its obligation to protect patients' Private Information and the risks associated with failing to do so. Woundtech knew that information of the type it collected, maintained, and stored is highly coveted and a frequent target of cyberattack.

32. Upon information and belief, Defendant's specific security failures include, but are not limited to:

(a) Failing to implement adequate access controls and credential management for cloud-hosted systems, including Defendant's cloud infrastructure and data warehouse;

(b) Failing to encrypt protected health information at rest in cloud storage, including clinical wound photographs;

(c) Failing to segment clinical image storage from other databases such that compromise of one system would not enable mass exfiltration of both;

(d) Failing to implement network monitoring, intrusion detection, and data loss prevention controls sufficient to detect and prevent the exfiltration of a large volume of data;

[14] DataBreaches.net, *supra*, n.1.

(e) Failing to implement and enforce reasonable data retention policies to minimize the volume of sensitive patient data stored on its systems;

(f) Failing to conduct regular security risk assessments and penetration testing;

(g) Failing to use industry-tested methods for security and to verify that third-party service providers have implemented reasonable security measures;

(h) Failing to train employees and contractors on data security practices; and

(i) Failing to timely notify affected patients once the breach was discovered and data exfiltration was confirmed.

**E. Defendant's Delayed and Inadequate Notice**

33. Despite becoming aware of the intrusion on or about December 6, 2025, and receiving confirmation of data copying on December 31, 2025, Defendant did not complete its review of the affected data until March 2, 2026, and did not begin issuing notices to affected patients until approximately March 16, 2026, more than three months after discovery.[15]

34. This delay exceeds the 60-day notice window prescribed by the HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400–414. It also exceeds the 30-day notice window required under Florida's Information Protection Act of 2014, Fla. Stat. § 501.171(4)(a), which requires notice to affected Florida residents "as expeditiously as practicable, but no later than 30 days after the determination of the breach."

35. The notice posted on Woundtech's website did not specify detailed measures or actions taken by Woundtech to remediate the vulnerabilities that led to the Data Breach, nor did it explain specific measures adopted to prevent future incidents.

[15] Woundtech, Notice of Data Breach, *supra*, n.7.

36. Defendant's breach notice did not disclose that a threat actor had publicly claimed responsibility for the breach nearly two months before notices were sent or that clinical wound photographs were reportedly among the exfiltrated files, thereby depriving patients of material information necessary to assess the severity of their exposure and take appropriate protective steps. The notice thus deprived patients of material information necessary to assess the actual severity of their exposure and take appropriate protective steps.

**F. Defendant's Obligations Under HIPAA, FTC Standards, and Industry Practice**

37. Woundtech is a covered entity under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and its implementing regulations. HIPAA establishes national minimum standards for the protection of individuals' medical records and other protected health information.

38. The HIPAA Privacy Rule (45 C.F.R. Part 160 and Subparts A and E of Part 164) requires appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of such information without patient authorization.

39. The HIPAA Security Rule (45 C.F.R. Part 160 and Subparts A and C of Part 164) establishes a national set of security standards for protecting health information that is kept or transferred in electronic form. The Security Rule requires Defendant to:

(a) Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity creates, receives, maintains, or transmits;

(b) Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

(c) Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

(d) Ensure compliance by its workforce.

40. HIPAA also requires Defendant to "review and modify the security measures implemented … as needed to continue provision of reasonable and appropriate protection of electronic protected health information" under 45 C.F.R. § 164.306(e), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

41. The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400–414, requires Defendant to provide notice of a breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of the breach."

42. Plaintiff does not bring claims in this action for direct violations of HIPAA. Rather, HIPAA and its implementing regulations establish the applicable standard of care for Defendant's obligations to Plaintiff and Class Members.

43. Federal and state governments have also established security standards and issued recommendations to minimize data breaches and the resulting harm to individuals. The Federal Trade Commission ("FTC") has issued numerous guides for businesses that highlight the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[16]

44. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established guidelines for fundamental data security principles. Among other things, the guidelines recommend that businesses properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's

---

[16] *See* Federal Trade Commission, Start With Security (June 2015), available at https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[17]

45. Additionally, the FTC recommends that companies limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[18]

46. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect PII, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

47. Woundtech failed to meet the standards established by HIPAA, FTC guidance, and industry best practices in the respects described herein.

**G. Plaintiff's Experience**

48. Plaintiff is a former Woundtech patient who received in-home wound care services from Defendant. During her treatment, Woundtech's clinicians collected Plaintiff's personal and medical information, including highly sensitive medical treatment photographs.

---

[17] *See* Federal Trade Commission, Protecting Personal Information: A Guide for Business (Oct. 2016).

[18] *Id.*

49. Plaintiff received a breach notification letter from Defendant stating that information relating to her may have been viewed or copied without authorization. The letter identified the following categories of compromised information: name, date of birth, telephone number, gender, clinical notes, medical health information, medical treatment information, medical diagnosis information, medical treatment images, and health insurance information.

50. Plaintiff is particularly distressed about the potential exposure of her medical treatment photographs and related treatment records to unauthorized individuals. The knowledge that such highly sensitive medical information may have been exfiltrated has caused Plaintiff significant emotional distress, anxiety, embarrassment, and loss of privacy.

51. Since the breach, Plaintiff has experienced an increase in unwanted telephone calls, which she attributes to the unauthorized disclosure of her personal information.

52. Plaintiff has spent and continues to spend time monitoring her accounts and medical records for signs of unauthorized activity and attempting to assess the scope of her exposure.

**H. The Impact of the Data Breach on Plaintiff and Class Members**

53. Woundtech's failure to keep Plaintiff's and Class Members' Private Information secure has severe ramifications. Given the highly sensitive nature of the PHI stolen in the Data Breach, such as clinical notes, medical diagnoses, treatment records, health insurance information, clinical wound photographs, and in some cases Social Security numbers, those who obtained the data can commit identity theft, medical identity theft, insurance fraud, and other identity-related fraud against Plaintiff and Class Members now and into the indefinite future.

54. Stolen PII is often trafficked on the dark web. When malicious actors infiltrate companies and exfiltrate PII, that stolen information frequently ends up on the dark web because the actors buy and sell that information for profit. Here, according to public reporting, FulcrumSec has published portions of the stolen data on publicly accessible websites.

55. The PII and PHI of consumers remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[19] Complete medical records are among the most valuable categories of stolen data, with a single patient's complete health record selling for hundreds of dollars on underground markets.[20]

56. The Private Information exposed in the Data Breach is highly coveted and valuable. Identity thieves can use PII and PHI to: (a) commit insurance fraud; (b) obtain a fraudulent driver's license or identification card in the victim's name; (c) obtain fraudulent government benefits; (d) file a fraudulent tax return using the victim's information; (e) commit medical and healthcare-related fraud, including obtaining medical services, prescription drugs, or medical devices in a victim's name; (f) access financial and investment accounts; (g) engage in mortgage fraud; and/or (h) commit any number of other frauds.[21]

57. Malicious actors often wait months or years before using PII obtained in data breaches, as victims become less diligent in monitoring their accounts after a significant period

---

[19] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs*, Digital Trends (Oct. 16, 2019), available at https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/; Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian (Dec. 6, 2017, updated 2025), available at https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

[20] *See* Fierce Healthcare, *Forget credit card numbers. Medical records are the hottest items on the dark web* (Jan. 2021), available at https://www.fiercehealthcare.com/hospitals/industry-voices-forget-credit-card-numbers-medical-records-are-hottest-items-dark-web (noting stolen medical records sell for up to $1,000 per record (Experian) or $250 per record (Trustwave)); *see also* Keeper Security, *What is the Value of Stolen Digital Data?* (citing IBM associate partner Michael Ash estimating stolen EMRs at up to $350 on the dark web), available at https://www.keepersecurity.com/blog/2017/05/12/what-is-the-value-of-stolen-digital-data/.

[21] *See* U.S. Government Accountability Office, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO-07-737 (June 2007), available at https://www.gao.gov/products/gao-07-737; *see also* U.S. Department of Justice, Criminal Division, *Identity Theft and Identity Fraud*, available at https://www.justice.gov/criminal/criminal-fraud/identity-theft/identity-theft-and-identity-fraud; Federal Trade Commission, *Identity Theft: A Recovery Plan*, available at https://www.identitytheft.gov.

has passed. These actors also reuse stolen PII, meaning individuals can be victims of multiple cybercrimes stemming from a single breach.[22]

58. Medical identity theft is among the most harmful and difficult-to-detect forms of identity theft. Unlike financial identity theft, which may be discovered through credit monitoring, medical identity theft can corrupt a victim's medical records with false information, including incorrect blood types, allergies, or diagnoses, that may not be discovered until the victim seeks medical care, potentially with life-threatening consequences.[23]

59. The emotional toll of data breach victimization is well documented. According to the Identity Theft Resource Center's 2021 Consumer Aftermath Report, among identity theft victims: 84% reported anxiety; 76% felt violated; 83% reported being turned down for credit or loans; and 48% reported sleep disturbances.[24]

60. Even in instances where an individual is reimbursed for a financial loss due to identity theft, that does not make the individual whole, as seeking reimbursement typically involves significant time and effort. The Department of Justice's Bureau of Justice Statistics found that identity theft victims reported spending an average of seven hours resolving issues related to a single incident of identity theft or fraud.[25]

61. The unauthorized disclosure of sensitive Private Information also reduces its inherent value to its owner, a harm that is an independent form of injury.

---

[22] *Id.*

[23] Pam Dixon, *Medical Identity Theft: The Information Crime That Can Kill You*, World Privacy Forum (May 2006), available at https://www.worldprivacyforum.org/2006/05/report-medical-identity-theft-the-information-crime-that-can-kill-you/; Lorri Zipperer, *Exploring Medical Identity Theft*, 11 Perspectives in Health Info. Mgmt. 1 (2010), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC2804460/.

[24]2021 Consumer Aftermath Report: How Identity Crimes Impact Victims, their Families, Friends, and Workplaces, Identity Theft Resource Center (May 2021).

[25]E. Harrell, Victims of Identity Theft, 2014, U.S. Department of Justice (Nov. 13, 2017), available at http://www.bjs.gov/content/pub/pdf/vit14.pdf.

62. The Data Breach is particularly harmful because of the nature of the compromised information. Clinical wound photographs depicting intimate areas of patients' bodies, medical diagnoses, treatment records, and health insurance information are among the most sensitive categories of personal data. The harm from unauthorized disclosure of such information extends beyond financial risk to include serious privacy and dignitary injuries that cannot be undone.

63. As a result of the Data Breach, Plaintiff and Class Members have suffered and continue to suffer concrete injuries, including but not limited to:

(a) The unconsented disclosure of confidential personal and medical information, including clinical wound photographs, to unauthorized third parties;

(b) Loss of privacy and loss of control over their Private Information;

(c) Emotional distress, anxiety, embarrassment, and humiliation resulting from the exposure of sensitive medical information and, for many Class Members, intimate medical images;

(d) A substantially increased and ongoing risk of identity theft, medical identity theft, and insurance fraud;

(e) Costs associated with the detection and prevention of identity theft and unauthorized use of financial and medical accounts;

(f) The present value of ongoing credit monitoring and identity-theft protection services necessitated by the Data Breach;

(g) Time spent and loss of productivity from addressing the consequences of the Data Breach;

(h) Diminution in the value of their Private Information;

(i) Overpayment for services received without adequate data security; and

(j) The continued and imminent injury flowing from potential fraud and identity theft posed by their Private Information being in the hands of unauthorized third parties.

64. Plaintiff and Class Members place significant value in data security. They would not have entrusted their Private Information to Defendant absent an understanding that Defendant would adequately protect it.

65. Plaintiff and Class Members have a continuing interest in ensuring that their Private Information, which upon information and belief remains in Defendant's possession, is protected from future breaches.

## CLASS ACTION ALLEGATIONS

66. Plaintiff brings this action on behalf of herself and all other persons similarly situated ("the Class") pursuant to Rules 23(a), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure. The proposed **Nationwide Class** is defined as follows:

> All persons residing in the United States whose personally identifiable information or protected health information was compromised as a result of the Data Breach, including all who were sent a notice of the Data Breach.

67. Excluded from the proposed Class are: (a) any officer or director of Woundtech; (b) any officer or director of any affiliate, parent, or subsidiary of Woundtech; (c) anyone employed by counsel in this action; (d) any judge to whom this case is assigned, his or her spouse, and members of the judge's staff; and (e) any governmental entities.

68. Plaintiff reserves the right to modify the Class definition or propose subclasses before the Court determines whether certification is appropriate.

69. **Numerosity**, Fed. R. Civ. P. 23(a)(1). Members of the proposed Class are so numerous that joinder of all members is impracticable. Upon information and belief, the Data Breach affected over 135,000 individuals. Membership in the Class is readily ascertainable from Woundtech's own records.

70. **Commonality**, Fed. R. Civ. P. 23(a)(2) and (b)(3). Common questions of law and fact exist as to all Class Members and predominate over questions affecting only individual members. These common questions include, but are not limited to:

(a) Whether Defendant owed a duty of care to Plaintiff and Class Members to safeguard their Private Information;

(b) Whether Defendant breached that duty by failing to implement reasonable data security measures;

(c) Whether Defendant's data security practices were consistent with HIPAA requirements, FTC guidance, industry standards, and applicable law;

(d) Whether the Data Breach was caused by Defendant's inadequate security practices;

(e) Whether Defendant knew or should have known of the vulnerabilities in its data security systems;

(f) Whether Defendant's notice to affected individuals was timely and adequate;

(g) Whether Defendant breached an implied contract with Plaintiff and Class Members to safeguard their Private Information;

(h) Whether Defendant was unjustly enriched by failing to invest adequately in data security while retaining the benefits of collecting patient data;

(i) Whether Plaintiff and Class Members are entitled to damages, injunctive relief, and/or other relief; and

(j) The appropriate measure of damages.

71. Woundtech engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, individually and on behalf of the other Class Members. Similar

or identical common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison to the numerous common questions that dominate this action.

72. **Typicality**, Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of the claims of the Members of the Class. All Class Members were subject to the Data Breach and had their Private Information accessed by and/or disclosed to unauthorized third parties. Woundtech's misconduct affected all Class Members in the same manner.

73. **Adequacy**, Fed. R. Civ. P. 23(a)(4). Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the other Class Members; she has retained counsel competent and experienced in complex class action litigation; and Plaintiff will prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and her counsel.

74. **Superiority and Manageability**, Fed. R. Civ. P. 23(b)(3). A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages suffered individually by Plaintiff and the other Class Members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Woundtech, making it impracticable for Class Members to individually seek redress. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation could lead to inconsistent or contradictory judgments. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

75. **Rule 23(b)(2).** Defendant has acted and refused to act on grounds generally applicable to the Class, making final injunctive and declaratory relief appropriate with respect to

the Class as a whole. Unless a class-wide injunction is issued, Defendant may continue in its failure to properly secure the Private Information of Class Members.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
*(On Behalf of Plaintiff and the Nationwide Class)*

76. Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 through 77 as if fully set forth herein.

77. Plaintiff brings this claim individually and on behalf of the Class.

78. Woundtech owed a duty to Plaintiff and the Class to exercise reasonable care in obtaining, securing, safeguarding, storing, and protecting Plaintiff's and Class Members' Private Information from being compromised, lost, stolen, and accessed by unauthorized persons. This duty includes, among other things, designing, maintaining, and testing its data security systems to ensure that Plaintiff's and Class Members' Private Information in Woundtech's possession was adequately secured and protected.

79. This duty arose from Defendant's status as a HIPAA-covered entity; the provider-patient relationship between Defendant and Plaintiff and Class Members; Defendant's undertaking to collect and store highly sensitive medical and personal information, including intimate clinical photographs; the standards established by HIPAA, FTC guidance, and industry practice; and the foreseeability of harm to Plaintiff and Class Members in the event of a breach.

80. Woundtech breached its duty by failing to exercise reasonable care and failing to safeguard and protect Plaintiff's and Class Members' Private Information. Woundtech's specific failures include those described in this Complaint, including failing to implement adequate access controls, encryption, network segmentation, monitoring, and data loss prevention measures.

81. It was reasonably foreseeable that Woundtech's failure to exercise reasonable care in safeguarding Plaintiff's and Class Members' Private Information would result in an unauthorized third party gaining access to such information.

82. By engaging in the negligent acts and omissions alleged herein, Woundtech failed to meet the data security standards set forth under HIPAA, FTC guidance, and Section 5 of the FTC Act, which prohibits "unfair … practices in or affecting commerce." Woundtech's failure to meet these standards is evidence of negligence.

83. Neither Plaintiff nor other Class Members contributed to the Data Breach.

84. But for Defendant's negligent acts and omissions, Plaintiff's and Class Members' Private Information would not have been compromised, exfiltrated, and disclosed.

85. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered and will continue to suffer injury, including but not limited to: (i) the unauthorized disclosure of their Private Information, including intimate medical photographs; (ii) loss of privacy; (iii) emotional distress, anxiety, embarrassment, and humiliation; (iv) a substantially increased and imminent risk of identity theft and medical identity theft; (v) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their Private Information; (vi) lost time and effort spent responding to the breach; (vii) the continued risk to their Private Information which remains in Woundtech's possession; (viii) future costs that will be required to prevent, detect, and repair the impact of the compromise; and (ix) overpayment for services received without adequate data security.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
*(On Behalf of Plaintiff and the Nationwide Class)*

86. Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 through 77 as if fully set forth herein.

87. Plaintiff and Class Members contracted or otherwise entered into relationships with Defendant for wound care and related healthcare services, in the course of which Defendant collected and maintained their Private Information.

88. Plaintiff and Class Members were required to provide their Private Information to Defendant as a condition of receiving wound care services from Defendant.

89. Plaintiff and Class Members reasonably understood that a portion of the funds paid for their care would be used to pay for adequate cybersecurity measures.

90. Plaintiff and Class Members reasonably understood that Defendant would use adequate cybersecurity measures to protect the Private Information that they were required to provide, based on Defendant's duties under state and federal law and its own policies.

91. Plaintiff and the Class Members accepted Defendant's offers by disclosing their Private Information to Defendant in exchange for wound care services.

92. In turn, and through internal policies and applicable legal obligations, Defendant agreed to protect and not disclose the Private Information to unauthorized persons.

93. Implicit in the parties' agreement was that Defendant would provide Plaintiff and Class Members with prompt and adequate notice of all unauthorized access to or theft of their Private Information. Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of such an agreement.

94. The covenant of good faith and fair dealing is an element of every contract. Parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing,

in connection with the execution of contracts and the discharge of obligations, mean preserving the spirit—and not merely the letter—of the bargain.

95. Plaintiff and the Class fully performed their obligations under the implied contracts with Defendant.

96. Defendant materially breached the implied contracts by:

(a) Failing to safeguard their Private Information;

(b) Failing to notify them promptly of the intrusion that compromised such information;

(c) Failing to comply with industry standards for data security;

(d) Failing to comply with the legal obligations incorporated into the agreements; and

(e) Failing to ensure the confidentiality and integrity of the electronic Private Information that Defendant created, received, maintained, and transmitted.

97. In these and other ways, Defendant violated its duty of good faith and fair dealing.

98. Defendant's material breaches were the direct and proximate cause of Plaintiff's and Class Members' injuries as detailed herein.

**COUNT III**
**UNJUST ENRICHMENT**
*(On Behalf of Plaintiff and the Nationwide Class)*

99. Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 through 77 as if fully set forth herein.

100. Plaintiff and Class Members conferred a monetary benefit upon Woundtech in the form of monies paid to Woundtech for healthcare services, with an implicit understanding that Woundtech would use some of these payments to protect the Private Information it collects, stores, and uses to provide care.

101. Woundtech accepted or had knowledge of the benefits conferred upon it by Plaintiff and Class Members. Woundtech also benefited from the receipt of Plaintiff's and Class Members' Private Information, as this was used to facilitate billing and payment services, clinical documentation, analytics, and other aspects of Woundtech's business.

102. As a result of Woundtech's conduct, Plaintiff and Class Members suffered actual damages in an amount equal to the difference in value between payments made with the reasonable data privacy and security practices that Plaintiff and Class Members paid for, and those payments without the data security practices they received.

103. Woundtech should not be permitted to retain the money belonging to Plaintiff and Class Members because Woundtech failed to adequately implement the data privacy and security procedures that Plaintiff and Class Members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

104. Woundtech should be compelled to disgorge for the benefit of Plaintiff and Class Members all unjust proceeds received as a result of the conduct and Data Breach alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully requests that the Court enter judgment in her favor and against Woundtech, as follows:

(a) Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

(b) Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, consequential damages, nominal damages, restitution, and disgorgement;

(c) Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate, including but not limited to requiring Woundtech to implement and maintain reasonable data security practices, encryption of protected health information at rest and in transit, segmentation of clinical image storage, regular third-party security audits and penetration testing, enhanced network monitoring and intrusion detection, reasonable data retention policies, comprehensive employee training on data security practices, and the provision of credit monitoring and identity-theft protection services to Class Members;

(d) Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

(e) Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses; and

(f) Granting such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all issues so triable.

**[SIGNATURE ON SUBSEQUENT PAGE]**

Dated: March 25, 2026

Respectfully submitted,

*/s/ Robert R. Jimenez*______________________
Robert R. Jimenez (Fla. Bar No. 72020)
**BRYSON HARRIS SUCIU & DeMAY PLLC**
201 Sevilla Avenue, Suite 200
Miami, Florida 33134
P: (786) 206-7896
rjimenez@brysonpllc.com
Secondary emails: lblanco@brysonpllc.com;
ajaramillo@brysonpllc.com

*Counsel for Plaintiff and the Proposed Class*